**No. _____**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re. Tahvio Gratton, Robin J. Shishido, and Dustin L. Collier,

*Petitioners*,

v.

UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF WASHINGTON

*Respondent,*

UNITED PARCEL SERVICE, INC.

*Real Party in Interest/Defendant.*

## PETITION FOR WRIT OF MANDAMUS DIRECTED TO THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON CASE NO. *1:22-cv-03149-TOR*

| | | |
|---|---|---|
| Dustin L. Collier | Robin J. Shishido | Norman Pine |
| Drew F. Teti | Richard E. Goldsworthy | Scott Tillett |
| **Collier Law Firm LLP** | **SHISHIDO TAREN GOLDSWORTHY PLLC** | **Pine Tillett LLP** |
| 240 Tamal Vista Blvd, Ste. 100 | 705 Second Ave., Ste. 1500 | 14156 Magnolia Blvd., Suite 200 |
| Corte Madera, CA 94925 | Seattle, WA 98104 | Sherman Oaks CA 91423 |
| (415) 767-0047 | (206) 622-1604 | 818-379-9710 |
| dcollier@collierlawsf.com | rshishido@shishidotaren.com | info@pineappeals.com |

*Attorneys for Appellants*
Tahvio Gratton, Robin J. Shishido, and Dustin L. Collier

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................2

INTRODUCTION................................................................................4

ISSUE(S) PRESENTED .....................................................................6

RELIEF SOUGHT ..............................................................................6

STATEMENT OF FACTS...................................................................7

PROCEDURAL HISTORY ...............................................................20

ARGUMENT ...................................................................................22

      A.    The *Bauman* Factors Weigh in Favor of Writ Relief ..............22

      B.    Respondent Erred in Granting a New Trial Based on Demonstrably False Findings of "Attorney Misconduct" ........25

CONCLUSION ...............................................................................38

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Bauman v. U.S. Dist. Court,*
    557 F.2d 650 (9th Cir. 1977)..................................................22, 23, 24, 25,

*California Sansome Co. v. U.S. Gypsum,*
    55 F.3d 1402 (9th Cir. 1995).......................................................25

*Cole v. U.S. Dist. Court for Dist. of Idaho*
    366 F.3d 813 (9th Cir. 2004).......................................................22

*DeGeorge v. U.S. Dist. Court for Cent. Dist. of Cal.,*
    219 F.3d 930 (9th Cir. 2000).......................................................24

*Hemmings v. Tidyman's, Inc.,*
    285 F.3d 1174 (9th Cir. 2002) ...............................................26, 36

*Jones v. Aero/Chem Corp.,*
    921 F.2d 875 (9th Cir. 1990).......................................................25

*Miksis v. Howard,*
    106 F.3d 754 (7th Cir. 1997) ....................................................26

*Newton v. Equillon Enterprises, LLC,*
    411 F.Supp.3d 856 (N.D. Cal. 2019) ..........................................26

*Sutkiewicz v. Monroe County Sheriff,*
    110 F.3d 352, 361 (6th Cir. 1997)...............................................25

*Tesser v. Board of Ed. of City School Dist. of City of New York,*
    370 F.3d 314, 321 (2nd Cir. 2004)..............................................26

*TXO Production Corp. v. Alliance Resources Corp.,*
    509 U.S. 443, 113 S.Ct. 2711, 125 L. Ed. 2d 366 (1993)...........................21

*United States v. Fei Ye,*
    436 F.3d 1117 (9th Cir. 2006)....................................................23

*United States v. Tillman,*
    756 F.3d 1144 (9th Cir. 2014)...........................................4, 5, 22, 23, 24, 38

*Van Dusen v. United States Dist. Court for the Dist. of Ariz.,*
    654 F.3d 838 (9th Cir. 2011)........................................................22

**Statutes**

42 U.S.C. § 1981 ............................................................................20

RCW 49.60....................................................................................20

## I.   INTRODUCTION

"[P]rofessional reputations are the essence of [a lawyer's] livelihood." *U.S. v. Tillman*, 756 F.3d 1144, 1150-1151 (9th Cir. 2014). The reputational harm resulting from an erroneous misconduct ruling immediately and irreversibly impacts the falsely impugned lawyer's practice *Id.* at 1150. In *Tillman*, this Court exercised mandamus jurisdiction following an erroneous order finding that counsel for a criminal defendant committed misconduct. *Ibid. Tillman* found that the attorney lacked an adequate remedy at law because his client might accept a plea, or be found not guilty, and the attorney would never have an opportunity to challenge the false misconduct findings on appeal. *Ibid.*

The same is true here. After Plaintiff Tahvio Gratton ("Gratton") achieved a historic civil rights victory, securing a $237.6 million retaliation and wrongful termination verdict against his employer on every cause of action presented, The District Court ("Respondent") granted a new trial based on erroneous findings of "attorney misconduct." 2 ER 130-131; 1 ER 7-13, 2-25. Respondent's new trial order clawed back its prior ruling that Gratton's counsel could introduce and publish, *inter alia*: (1) Gratton's EEOC charge; (2) evidence of prior discrimination and retaliation complaints made against his supervisor to demonstrate a "retaliatory work environment"; and (3) evidence of financial condition in support of punitive damages,

4

including foundational defense witness testimony. 2 ER 153-161,[1] 167-168, 174; 8 ER 1933-1934; 5 ER 1211-1212; 7 ER 1539-1541.

Thus, the same fundamental principles warranting writ relief in *Tillman* support Gratton's request for writ relief for himself and his counsel here. Respondent's baseless misconduct findings are causing irreparable reputational harm that cannot be remedied after-the-fact. Shishido Decl., ER 2057-2059; Collier Decl., ER 2051-2056. Like *Tillman*, Gratton may settle or prevail again on retrial, depriving his counsel of the opportunity to clear their names on appeal. Moreover, even a successful post-judgment appeal cannot undo the reputational harm and resulting loss of business that will have occurred (and, indeed, is already occurring).

Respondent's error was repeated and is likely to recur on any retrial, further supporting the propriety of writ relief. Immediate relief from this Court would provide guidance in this case, and countless others, declaring once and for all that a new trial for purported "misconduct" can never be based on conduct the trial judge expressly allowed.

//

//

---

[1] All citations to the Excerpts of Record will follow the same format: [Vol. No.] ER [Page No(s).]

5

## II.    ISSUES PRESENTED

1.  Is it "attorney misconduct" for trial counsel to introduce exhibits the district court admitted into evidence, to publish exhibits the district granted counsel permission to publish, and to inquire into subject matters the district court expressly allowed inquiry into?

2.  Should district court judges be estopped from finding "attorney misconduct" sufficient to warrant a new trial where the court expressly permitted the attorney's conduct in real time, only characterizing it as purported "misconduct" after-the-fact?

3.  Is the ongoing reputational harm and loss of business counsel is experiencing as a result of Respondent's erroneous misconduct findings sufficient to warrant writ relief?

As detailed herein, the answer to Issue 1 is clearly "no," while the answer to Issues 2 and 3 is a resounding "yes."

## III.    RELIEF SOUGHT

Gratton seeks a writ of mandamus directing the U.S. District Court for the Eastern District of Washington to vacate its new trial order based on erroneous findings of "attorney misconduct."

## IV. STATEMENT OF FACTS

### A. Gratton Comes to the Yakima UPS Center Following "High Marks" in Seattle.

Gratton was hired as a Driver for UPS in 2016. 6 ER 1335-1336. Upon transferring to the Yakima UPS Center ("Center"), Seattle management reported that Gratton "was a really good driver" and a "great asset to the driver ranks." 5 ER 1223-1224, 6 RT 1519-1520. Prior to Yakima, Gratton had no disciplinary history and filed no grievances or complaints. 5 RT 1224; 3 RT 1416, 1438, 1520.

In Yakima, Gratton began to experience harassment and retaliation at the hands of Center management. 6 RT 1341. In April 2018, Supervisor Sam O'Rourke (Caucasian) accompanied Gratton (African-American) for a "ride-along," degrading Gratton by calling him "Boy" throughout his route. 3 ER 429-430 (MSJO Exh. C).[2]

UPS customer Alyssa Haslam witnessed O'Rourke speaking to Gratton in a "condescending tone," stating "[e]very time this man talked to Tahvio [Gratton] … he called him 'boy.'" 3 ER 548 (MSJO Exh. G). Based on his tone, repetition of the slur, repeated "barking [of] orders" at Gratton, and overall demeanor, Haslam was "certain" O'Rourke's conduct was racially motivated. 3 ER 548-549.

---

[2] Everywhere "MSJO" is cited, this refers to evidence that was presented in Gratton's summary judgment opposition yet improperly excluded at trial.

7

Gratton reported the harassment to Center Manager Erik Loomis, who responded with indifference. 3 ER 430 (MSJO Exh. C). No disciplinary action was taken; indeed, O'Rourke was later *promoted*. 3 ER 519-520 (MSJO Exh. F).

UPS retaliated against Gratton for reporting harassment. Supervisor Matthew Fromherz, a friend of O'Rourke's, yelled at Gratton to "Get the fuck off the property!" on a day when Gratton was at the Center off-shift. 3 ER 430 (MSJO Exh. C); 3 ER 559 (MSJO Exh. H). Fromherz also removed Gratton from the schedule. 3 ER 432 (MSJO Opp. Exh. C).

In June 2018, Gratton filed grievances reporting O'Rourke's harassment and Fromherz's retaliation. 3 ER 503-508, 576-579 (MSJO Exhs, D-E, I-J). In response, Center management began accusing Gratton of "taking too long" on his route even though he "was one of the most efficient drivers." 3 ER 420 (MSJO Exh. A). Meanwhile, slower white drivers were not criticized. *Ibid.*

Other black drivers were subjected to the same discrimination. Loomis and Fromherz took stops off the routes of junior white drivers, allowing them to have easier, faster routes, while overloading senior black drivers and falsely accusing them of being "slow." 3 ER 374-375 (MSJO Exh. M).

Gratton and other black drivers were disciplined for showing tattoos while white drivers were not. 3 ER 383-384, 392-393, 429, 612-613, 618-620 (MSJO Exhs. R, V, C, S, and T).

8

Loomis refused to let Black UPS driver Travis Anderson drive unless he cut his hair—a rule white UPS driver Grant Elsworth was exempted from. 3 ER 391-392 (MSJO Exh. V). Loomis's sudden refusal to let Anderson work unless he cut his hair interfered with his religious/cultural traditions. *Ibid.*; 3 ER 611-612 (MSJO Exh. S). Anderson discussed this with Gratton, who helped him file for a religious exemption. 3 ER 392 (MSJO Exh. V). Loomis responded by forcing Anderson to conceal his tattoos with makeup and sleeves, while white drivers displayed tattoos openly. *Ibid.*

Loomis also targeted black UPS Preloader Xavier Briggs, requiring him to repeatedly complete a timed route to become a Driver, while no such test was required for white employees seeking the same role. 3 ER 374-375 (MSJO Exh. M). When Briggs noticed stops being added to his route and the routes of other black drivers (Gratton and Anderson) while white driver routes were being *shortened*, he confronted Loomis, saying "I think this is a racial thing." 3 ER 377-378. Loomis then added more stops, working Briggs even longer hours. *Ibid.*

On October 19, 2018, Gratton filed an EEOC charge alleging as follows:

9

> I have been an employee of UPS for 2 years. I was hired on September 26, 2016, as a delivery driver to the present. In January of 2018, I transferred from Seattle to Yakima to be closer to my family. As soon as I began working in Yakima my supervisors were hostile to me and began discriminating against me and harassing me on the basis of my race. Examples of the discrimination and harassment I suffered includes but is not limited to being denied work hours and being laid off in favor of less qualified non-black employees and part-time employees, being yelled at and unfairly reprimanded including being thrown off company property, and regularly being called "boy" in a racially derogatory manner by my white supervisor.
>
> I made complaints about this conduct which went unresolved. Specifically, I filed a complaint about being called "boy" as being racially offensive and discriminatory, and I filed a complaint for the denial of work hours. Following my complaints, I was retaliated against including an increase in harassment from my superiors.

8 ER 1932 (Trial Exhibit ("Exh.") 9).[3]

In June 2020, Gratton filed grievances alleging that Loomis was discriminating against him by threatening him with termination if he refused to falsify his package count—contrary to established protocols—in order to deprive him of a bonus. 8 ER 1940-1952 (Exhs. 19-20); 6 ER 1348-1357. No such measures were taken against a Caucasian driver with a similar, bonus-level package count. *Ibid.* Gratton reported that "Erik Loomis has an issue with black skin," identifying Anderson, Briggs, and the fourth black driver, Klayton Fleming, as additional "witnesses and victims." 8 ER 1942.

On February 3, 2021, Gratton filed another grievance alleging "continuous harassment and retaliation from Loomis." 8 ER 1983-1986 (Exh. 31). Gratton

---

[3] Unless otherwise noted, all cited trial exhibits were admitted into evidence.

10

reported that Loomis: (1) overloaded Gratton's route; (2) assigned him to a dangerous truck; and (3) instructed supervisors to retaliate against him. *Ibid.*

Fromherz helped Loomis overload Gratton's route. 6 ER 1361-1365, 1380-1381; 8 ER 2021 (Exh. 72). When Gratton successfully bid onto another route, his retaliators repeated the overloading process. 6 RT 1365-1371; 8 ER 1935-1939, 1981-1982 (Exhs. 16, 18, and 26).

Gratton was assigned the so-called "death truck," a well-known punitive measure due to its manual transmission and lack of a heater, back-up camera, or functional fuel gauge. 6 ER 1377-1378. Truck assignments normally remain with a given route, but when Gratton transferred to a new route, Center management transferred the "death truck" with him. 6 ER 1379-1380.

Management also withheld wages from Gratton, forcing him to file repeated grievances to receive his earned pay. 6 ER 1399; 8 ER 1953-1980, 1987-1991, 1996-1998 (Exhs. 21-25, 32, and 35). The UPS managers Gratton accused of retaliation in these pay-related grievances were directly involved in the "investigation" that led to Gratton's termination. 8 ER 1961 (Exh. 22) (grievance alleging retaliation by Brandon Ward and Erik Loomis), 2015 (Exh. 46) (termination letter signed by Loomis), 2018-2020 (Exh. 48) (Loomis was a termination decision-maker), 2045-2046 (Exh. 662) (Ward statement); 1 ER 1136-1137 (Ward statement relied upon for termination decision).

11

Utility Driver Derek Tamez sought reimbursement of an expense from a member of Loomis' management team, only to have the manager shout: "Somebody put you up to this, didn't they? It was that nigger Tahvio, wasn't it?" 4 ER 669-670 (MSJO Exh. CC). Tamez reported the slur to Loomis, who took no action. 4 ER 670-671 (MSJO Exh. CC).

Gratton was scrutinized for minor infractions that others committed with impunity, including: (1) taking a 29-minute lunch break; (2) wearing a UPS-issued headband; and (3) requesting to wear non-standard footwear as a medical accommodation. 6 ER 1390, 1394, 1404-1408; 8 ER 1992 (Exh. 33).

On September 9, 2021, Gratton filed his final pre-termination grievance— alleging ongoing retaliation by Center management. 8 ER 1993-1995. The letter was directed to Loomis and UPS Labor Manager Karl Leyert. *Ibid.*

Loomis and Leyert wrongfully terminated Gratton the following month. 8 ER 2015 (Exh. 46) (termination letter signed by Loomis), 2016-2020 (Exh. 48) (UPS reports to government agency that Loomis made the termination decision); 5 ER 1092, 1097-1098, 1104-1106; 8 ER 2013, 2015 (Exhs. 43, 46) (Leyert pre-drafted termination letter).

### B. Multiple Disinterested Witnesses Corroborate the Retaliation.

Former UPS employee Lisa Irvine overheard Center management, including Loomis, Fromherz, and Brandon Ward, discussing their desire to wrongfully

terminate Gratton following his protected activities. 5 ER 1211-1214; *see also* 5 ER 1174-1175 (Fromherz and Ward were supervisors who reported directly to Loomis). All three managers were involved in the "investigation" that led to Gratton's termination. 8 ER 2037-2044 (Exh. 660), 2015 (Exh. 46), and 2018-2020 (Exh. 48).

Irvine confirmed that Fromherz drew numerous HR complaints from workers alleging he was retaliating against employees who, like Gratton, had gotten on his bad side. 6 ER 1227-1232; 8 ER 1933-1934 (Exh. 14). Irvine expressed fear for her own safety when reporting these incidents to management. 6 ER 1227-1232.[4] These concerns were raised for years, yet Fromherz was allowed to continue retaliating against workers. 6 ER 1233-1235.

Former UPS Preload Supervisor Michelle Reyes testified that Fromherz and Loomis frequently spoke about terminating Gratton in her presence. 6 ER 1249-1250. She also observed them retaliating against Gratton by overloading his route. 6 ER 1250-1252.

Former UPS Preloader Xavier Briggs testified that Loomis was "very hostile" towards Gratton. 6 ER 1261. Loomis warned Briggs to "be careful" about "associating with" Gratton and "stirring up a hornet's nest," adding that it "could

---

[4] Respondent improperly excluded highly probative evidence of UPS's retaliatory intent: Irvine's testimony that she was terminated, after twenty-nine years of employment, a mere two weeks after her deposition revealed management discussing their desire to wrongfully terminate Gratton. 2 RT 272:4-273:12

13

make your career here very stressful." 6 ER 1261-1262. Loomis coupled this threat with questions "fishing for dirt" he might use against Gratton. *Ibid.* Loomis characterized the foregoing as a "battle" Gratton was "not going to win." 6 ER 1262.

Like Briggs, UPS Drivers Avelardo Perez and Klayton Fleming testified that management warned employees to avoid Gratton. For example, Fromherz told Fleming that Gratton was "no good" and warned Fleming to not "associate with" him. 6 ER 1275-1276, 1471.

UPS Driver Grant Elsworth was reprimanded by Center management for assisting Gratton with his overloaded route. Specifically, manager Bill Peterson said, "Fuck that guy" and called Gratton "manipulative." 6 ER 1492.

Critically, Assistant Preload Supervisor Linda Hernandez told Elsworth she "didn't like" Gratton because "he complains too much." 6 ER 1489. Hernandez reported directly to Fromherz, and they were personal friends who spent significant time together outside of work, staying in touch long after Hernandez left UPS. 7 ER 1611, 1669, 1679, 1681-1682. When Gratton later tripped in the loading dock and braced himself on Hernandez, Fromherz and Loomis directed her to file an HR complaint to falsely accuse Gratton of "harassment," long *after* her casual confession of retaliatory intent to Elsworth. 5 ER 1135-1136; 7 ER 1655-1657.

Finally, Loomis testified that Leyert expressed contempt for Gratton's grievances, directing Loomis to get them "under control." 7 ER 1541-1542. Loomis

14

has *personally* drawn approximately 50 retaliation complaints from employees, none of which prompted remedial action. 6 ER 1513-1516.

### C. Gratton is Falsely Accused of "Unprovoked Assault on a Supervisor."

On October 19, 2021, before the drivers' morning meeting ("PCM" meeting), Gratton stumbled in the loading dock area and braced his fall, accidentally making contact with Hernandez's back. 5 ER 1139-1140; 6 ER 1421; 8 ER 2028-2029 (Exhs. 89B-89C).

The loading dock where Gratton tripped is well known for its tripping hazards—numerous UPS drivers testified to tripping or seeing others trip in the same location. 5 ER 1193-1194; 6 ER 1282, 1474-1475, 1493. UPS uses "mobile" loading docks that can be relocated at various points along the permanent concrete dock, creating lips, gaps, and other uneven surfaces as depicted in this picture of the location where Gratton fell:

 

15

8 ER 2028-2029 (Exhs. 89B-89C).

When Gratton tripped, Hernandez was squatting down to lift (or drop) a box. 6 ER 1419. She could not see Gratton stumble or what caused him to fall. 7 ER 1674.

At trial, Hernandez repeatedly lied about her relationship with Fromherz (among other things) on the stand, devastating her credibility. 7 ER 1611 (Fromherz and Hernandez went to gym daily together for 3-4 months), 1669 (Hernandez initially claims to not recall spending time with anyone from UPS outside of work, then acknowledges going to the gym with Fromherz for three to four months and going to lunch with him approximately every other month); 1681-1682 (Hernandez initially denies speaking to Fromherz since leaving UPS, then admits she asked him for, and he provided, reference letters for her scholarship), 1679 (Fromherz permitted Hernandez to commit timecard fraud, receiving guaranteed pay for 27 hours of work while leaving early), 6 ER 1242, 1244 (after HR learned that Fromherz permitted Hernandez to commit timecard fraud, they changed her schedule without imposing discipline).

Hernandez (with her subordinate Jose Castillo) reported Gratton's accidental contact to her supervisor and friend, Fromherz, mischaracterizing his fall as an act of "harassment." 5 ER 1135-1136; 7 ER 1655. Loomis and Fromherz directed Hernandez and Castillo to initiate the investigation that led to Gratton's termination. 7 ER 1655-1657; 8 ER 2037-2044 (Exh. 660) (Fromherz worked closely with the

investigator, directed the investigation, and collected all witness statements submitted to the investigator).

### D. Leyert Ratifies and Participates in the Retaliation.

Labor Manager Karl Leyert had supervisory authority over more than 3,500 UPS hourly employees, as well as approximately 200 UPS managerial and supervisory employees, including all the individuals named above. 5 ER 1056-1058.

On February 3, 2021, Leyert received a copy of a grievance filed by Gratton alleging "continuous harassment and retaliation" by Loomis. 5 ER 1065; 8 ER 1983-1986 (Exh. 31). Gratton reported the same retaliation allegations corroborated by his coworkers at trial, including the overloaded route, "death truck" assignment, and overall pattern of retaliation by Loomis's management team. *Ibid.*

On September 9, 2021, Gratton filed another grievance alleging ongoing retaliation, which was also routed to Leyert. 5 ER 1089. This grievance alleged that management "constantly manipulated his route to make him look like a slow driver" and "intimidated him with a ride-along." 5 ER 1090; 8 ER 1993-1995 (Exh. 34).

UPS *stipulated* that Gratton reasonably believed all the pre-termination discrimination, harassment, and retaliation allegations were true. 2 ER 179, 184 ("UPS will stipulate to the protected activity element of his retaliation claims (including the reasonable belief component)."); 6 ER 1347 (Respondent instructs jury re: stipulation).

17

In his deposition, Leyert testified that it was "definitely" established policy for him to route discrimination grievances to Human Resources ("HR") or Security, so that a proper investigation can be conducted. 5 ER 1848-1849; 8 ER 2047- 2050.[5] Because Gratton's grievance alleged discrimination, it was subject to the company's "prompt and thorough investigation" policy. 5 ER 1087; 8 ER 2027 (Exh. 79).

Nevertheless, Leyert singled Gratton out, withholding Gratton's discrimination and retaliation complaints from HR and Security while purporting to "investigate" the complaints himself. 5 ER 1074-1077. Although Leyert offered no satisfactory explanation for this ad hoc change in policy, the reason soon became obvious: Leyert chose not to interview *any* of the witnesses Gratton identified and even refused to interview Gratton himself. 5 ER 1081-1082.

Leyert nevertheless insisted at trial that he "looked into all the facts and circumstances" of Gratton's allegations, claiming that he was "fully apprised" of the pertinent facts—testimony that eviscerated his credibility. 8 ER 1852. Leyert ratified every single adverse action that the jury unanimously found to be retaliatory. 8 ER 1853. Leyert later committed the ultimate act of retribution *personally*—wrongfully terminating Gratton's employment just one month after his latest retaliation grievance. 5 ER 1092.

---

[5] This clip was played to impeach Leyert's contrary trial testimony.

18

At trial, Leyert acknowledged that "unprovoked assault" is one of very few offenses that would justify terminating Gratton without a prior written warning and that "sexual harassment" is not an immediately terminable offense under the collective bargaining agreement. 5 ER 1092-1095, 1097-1098; 8 ER 2024 (Exh. 75). However, both Hernandez nor Castillo reported the tripping incident as "sexual harassment" and not "assault." 8 ER 2041. Therefore, Leyert had to mischaracterize the "harassment" allegations as "assault" to justify the termination. 5 ER 1165, 1653, 1671-1672; 8 ER 2007-2012, 2024-2025 (Exhs. 38, 39, 42, 75).

Leyert needed the investigator assigned to Hernandez's "harassment" complaint to substantiate "assault" allegations, despite the absence of any such allegation. On October 26, 2021, Leyert emailed the investigator to *explicitly direct him* to make the required assault finding, with the subject "Tahvio Gratton Termination Assault." 8 ER 2013 (Exh. 43). Leyert even attached a *pre-drafted* termination letter. 8 ER 2013, 2015 (Exhs. 43, 46).

This correspondence occurred while the sham "investigation" was still in its infancy and Gratton had not yet been interviewed. 5 ER 1106. In addition to directing the investigator's pretextual "assault" finding, Leyert directed the investigator to forward the termination letter to HR for processing *before* any meaningful investigation had occurred. 8 ER 2014 (Exh. 45).

The jury rejected UPS's thinly-veiled pretext for Gratton's retaliatory termination, finding in Gratton's favor on every cause of action presented. 2 ER 130-131.

## V. PROCEDURAL HISTORY

Gratton's operative Complaint alleged discrimination, hostile work environment, and retaliation under 42 U.S.C. § 1981 and the Washington Law Against Discrimination ("WLAD"), RCW 49.60 *et seq.*, as well as wrongful termination in violation of public policy. 3 ER 331.

UPS moved for summary judgment. 2 ER 291. On April 22, 2024, Respondent ruled on the motion. 2 ER 291-301; 3 ER 327-365. Respondent dismissed Gratton's discrimination and harassment claims. 3 ER 341-350.[6] Gratton's retaliation and wrongful termination claims survived. 3 ER 350-356.

On August 28, 2024, Respondent issued an Order ruling on motions *in limine* ("MIL") and other evidentiary matters. 2 ER 132-176. Three rulings are relevant here: (1) Respondent reiterated that Gratton could introduce his EEOC charge into

---

[6] Given the overwhelming evidence of racial discrimination and hostile work environment harassment, the summary judgment ruling was patently erroneous. However, Gratton does not contend that *this* ruling will cause irreparable harm, and thus he does not seek writ relief as to the summary judgment order. Instead, Gratton is concurrently filing a protective notice of appeal, preserving his right to pursue full appellate review if this Court grants the writ and restores the judgment.

evidence, but barred him from introducing any other evidence of the events described therein; (2) Respondent denied UPS's motion to exclude numerous complaints of discrimination and retaliation brought against Fromherz by other employees, expressly granting Gratton permission to introduce the complaints (Exh. 14) to demonstrate a "retaliatory work environment"; and (3) Respondent declined to rule on the admissibility of UPS 's Form 10-K, "unless and until the jury returns a verdict for punitive damages."[7] 2 ER 153-161, 167-168, 174; 8 ER 1933-1934.

The third ruling came as a surprise, given that neither party requested bifurcation. On the first day of trial, Respondent changed course, deciding *not to bifurcate* and permitting financial condition evidence. 5 ER 956-957; *see also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 n. 28 (1993) (it is "well-settled" that financial condition is "typically considered in assessing punitive damages").

On February 12, 2025, Respondent granted UPS's Motion for a New Trial, based on erroneous findings of "attorney misconduct." 1 ER 2-25. *Inter alia*, Respondent faults Gratton's counsel for: (1) introducing and publishing the EEOC charge; (2) attempting to introduce financial condition evidence; and (3) introducing evidence of the prior complaints against Fromherz, all of which Respondent *expressly* permitted Gratton to do. *Ibid.*

---

[7] Respondent never did rule on the admissibility of the 10-K despite that the jury ultimately did return a verdict for punitive damages. 1 ER 12.

## VI.   ARGUMENT

### A.    The *Bauman* factors weigh in favor of writ relief.

In determining whether to exercise mandamus jurisdiction, this Court considers the five factors articulated in *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977):

> (1) Whether the petitioner has other adequate means, such as direct appeal, to attain the relief he or she desires; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order makes an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems, or legal issues of first impression.

*Tillman*, 756 F.3d at 1150; *Van Dusen v. United States Dist. Court for the Dist. of Ariz.*, 654 F.3d 838 (9th Cir. 2011).

A "petitioner need not establish all five factors." *U.S. v. Fei Ye*, 436 F.3d 1117, 1122 (9th Cir. 2006). Only "[t]he third factor, clear error as a matter of law, is a necessary condition for granting a writ of mandamus"—the remaining factors are useful as analytic tools (none are dispositive). *Id.* at 841; *Bauman*, 557 F.2d at 655 ("rarely if ever will a case arise where the guidelines point in the same direction or even where each guideline is relevant or applicable"); *Cole v. U.S. Dist. Court for Dist. of Idaho*, 366 F.3d 813, 817 (9th Cir. 2004) ("Questions of degree and 'conflicting indicators' frequently arise [] rendering the factors unsuitable for mechanical application.").

22

*U.S. v. Tillman* is highly analogous and instructive. This Court granted writ relief following the district court's erroneous misconduct finding. 756 F.3d at 1150. On appeal, counsel represented that the district court's order had:

> . . . collateral effects on his reputation and professional endeavors. He is a death penalty specialist who has been qualified as learned counsel in many districts, and his ability to participate in capital proceedings is critical to his clients and to his own livelihood.

*Id.* at 1151. This Court noted that—according to counsel—judges had already questioned him about the order, resulting in further harm to both his reputation and his clients' rights. *Tillman* recognized:

> Lawyers do not have a ready "toolkit" for their profession. Instead, their professional reputations are the essence of their livelihood. Reputations matter—to the court, to clients, to colleagues, and to the public.

756 F.3d at 1151. *Tillman* found that the attorney lacked an adequate remedy at law because his client might accept a plea, or be found not guilty, and the attorney would never have an opportunity to challenge the false misconduct findings on appeal. *Ibid.*

Here, all five *Bauman* factors weigh in favor of writ relief. Gratton satisfies the first *Bauman* factor for the same reasons as *Tillman*. Gratton may settle or prevail again on retrial, thereby depriving his counsel of the opportunity to clear their names on appeal.

Gratton also meets the second and third *Bauman* factors. Like *Tillman*, Respondent's conclusion that Gratton's counsel engaged in misconduct sufficient to permeate the entirety of the proceedings is clearly erroneous (discussed further in

23

section VI.B, below). Gratton's attorneys' reference to the contents of *admitted* exhibits and testimony—principally, his EEOC charge—simply does not constitute misconduct. Respondent's contrary ruling defies common sense. *DeGeorge v. U.S. Dist. Court for Cent. Dist. of Cal.*, 219 F.3d 930, 936 (9th Cir. 2000).

This error is causing irreparable reputational harm that cannot be remedied after-the-fact. Aside from writ relief, no adequate remedy exists—a post-judgment appeal cannot undo the reputational harm and resulting loss of business that will have already occurred.

Civil rights employment lawyers work in a complex, specialized area of law. Gratton's counsel have been practicing employment law for over a decade and have become experts in this niche field. Shishido Decl., ¶¶ 1-5, 8 ER 2057-2059. One of them has built a business model of trying cases for other attorneys, which depends entirely on the firm's reputation for ethically and successfully trying cases. Collier Decl., ¶¶ 14-17, 8 ER 2051-2056.

While Respondent's erroneous "misconduct" findings occurred only recently, the reputational harm is already tangible. Numerous colleagues have contacted Gratton's counsel asking about Respondent's finding of "misconduct," and one of them already attended a settlement conference where the order was weaponized. Shishido Decl., ¶¶ 6-10, 8 ER 2057-2059; Collier Decl., ¶¶ 18-20, 8 ER 2051-2056.

24

The fourth *Bauman* factor is also satisfied here. Respondent's new trial order reflects the same erroneous misconduct finding repeated across numerous prior rulings and pieces of admitted evidence, demonstrating flagrant disregard for federal law that is likely to recur in any retrial.

Finally, no published case has held that a new trial may be ordered for purported "attorney misconduct" where the purported misconduct is: (1) the introduction of evidence the district court admitted; (2) the publishing of exhibits the court permitted counsel to publish; and (3) the inquiry into subjects the court expressly allowed. This issue of first impression satisfies the fifth *Bauman* factor.

## B.  Respondent erred in granting a new trial based on demonstrably false findings of "attorney misconduct."

To obtain a new trial based on alleged attorney misconduct, "the movant must (1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct; and (2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense." *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-879 (9th Cir. 1990); *see also California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995). The moving party ordinarily "must make a concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end." *Sutkiewicz v. Monroe*

*County Sheriff*, 110 F3d 352, 361 (6th Cir. 1997); *Newton v. Equillon Enterprises, LLC*, 411 F.Supp.3d 856, 878 (N.D. Cal. 2019).

Even where attorney misconduct has "permeated" the entire proceeding, the moving party must also prove that it "unfairly influence[d] the jury's deliberations and verdict" to warrant a new trial. *Tesser v. Board of Ed. of City School Dist. of City of New York*, 370 F3d 314, 321 (2nd Cir. 2004). "[I]mproper comments during closing argument rarely rise to the level of reversible error." *Miksis v. Howard*, 106 F3d 754, 764 (7th Cir. 1997) (citation omitted).

Finally, the moving party must have objected to the misconduct, permitting the district court an opportunity to cure any resulting prejudice. *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) ("allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error.").

Here, there simply was no misconduct, much less "clear and convincing evidence" of misconduct that "permeated" the entire trial and to which UPS timely objected. Nor did UPS demonstrate that any purported misconduct influenced the jury's deliberations or the verdict.

Respondent bases its "misconduct" findings on Gratton's purported "violation" of the MIL rulings—namely, Gratton's counsel's references to the EEOC charge at trial. 1 ER 7-13. But an attorney's reference to *admitted evidence* is plainly not

26

misconduct. Respondent ruled not once but twice, *in writing*, that Gratton could

introduce the EEOC charge into evidence to prove he engaged in protected activity:

> Notably, the EEOC document—which was filed within the
> limitations period—references events outside the limitations
> period. Therefore, while *the EEOC document itself may come in as*
> *evidence of Plaintiff engaging in protected activity*, Plaintiff may not rely
> upon evidence of the discrete acts mentioned within that
> document to prove his retaliation and discrimination claims.

3 ER 352, fn. 5 (summary judgment order); 2 ER 154 (order on MILs) (italics added,

Respondent's emphasis omitted).

Then, in ruling on UPS's new trial motion, Respondent conspicuously omits its

prior rulings (where it had admitted the EEOC charge into evidence). 1 ER 8. At trial,

Gratton indisputably obeyed Respondent's ruling, refraining from presenting evidence

of the discrete acts mentioned in the EEOC charge, and instead introducing only the

EEOC charge itself, precisely as Respondent directed. 3 ER 352, fn. 5; 2 ER 154.

Respondent's next finding of "misconduct" is that Gratton purportedly

"highlighted" the EEOC charge in his opening statement. 1 ER 8. Respondent again

ignores that: (1) UPS objected to this opening statement slide *before* it was given; (2)

Gratton reminded Respondent that it had previously admitted the EEOC charge into

evidence; (3) UPS's counsel responded, "It is true that your Honor did say that the

EEOC charge can be discussed"; and (4) Respondent *expressly* permitted Gratton to

reference the EEOC charge. 5 ER 961-968, 1026 ("If they want to use those [slides],

they're allowed to.")

27

Notably, UPS *expressly waived* any objection to the admission of the EEOC Charge during pre-trial proceedings. 8 ER 1932 (Exh. 9). UPS unequivocally represented that it had "[n]o objection" to the admission of "Gratton's EEOC Charge." 2 ER 261; see also 2 ER 284-285 (order requiring the parties to exchange exhibits and lodge objections in advance).

The new trial order then criticizes Gratton's counsel for "read[ing], verbatim, the EEOC complaint into the record," noting that Gratton did so "[o]ver Defendant's objection." 1 ER 9. Yet again, Respondent *overruled* UPS's objection, received the exhibit into evidence, and expressly permitted Gratton's counsel to "publish" the EEOC charge to the jury. *Ibid.*; *cf.* 6 ER 1331-1332; 8 ER 1932 (Exh. 9).

Similarly, Respondent cites an example of Gratton's counsel "question[ing] Fromherz about the EEOC charge," but Respondent's own order acknowledges that "Defendant's objection [was] overruled." 1 ER 9. Indeed, on this occasion, Respondent admonished *UPS's counsel* for repeatedly objecting to the EEOC charge, stating, "Your objection is overruled. He can ask the witness [about] this exhibit that's already been admitted." 7 ER 1619.

Respondent also cites a single example of a third-party witness (UPS driver Travis Anderson) bringing up the "boy" comment, unprompted by Gratton's counsel:

> What do you mean by he would call a spade a spade?
> If something was *going on in the building* that, like, he felt was wrong, he'd call it out.
> And are you aware of any examples of that?

28

> Yes. There is -- there was an instance in which he was called
> "boy."
> Objection, your Honor. Motion in limine.
> Yeah. Sustained. Move on.

5 ER 1178-1179 (italics added).

Gratton's counsel could not possibly have known that Anderson would reference the "boy" incident, which occurred during Gratton's "ride along" with O'Rourke, in response to counsel's question about Gratton calling out unfairness "in the building." 5 ER 1178-1179. A driver's "ride along" occurs on their route, not "in the building" (*i.e.*, the Center), and Anderson was not present on the "ride along" at issue. Moreover, UPS objected before Anderson had any opportunity to elaborate, which Respondent immediately sustained, ending the inquiry. 5 ER 1180.

UPS did not move to strike the answer or request a curative instruction, presumably recognizing there was zero prejudice to be cured. The jury had merely heard an allegation that Gratton was called "boy"—an allegation that was *already in evidence* through the EEOC charge and UPS's own *stipulation* that it was reasonable for Gratton to believe it to be true. 6 ER 1347; 8 ER 1932 (Exh. 9). Anderson's comment could not possibly have swayed the jury, given that it provided no new information. Regardless, a third-party witness's unprovoked comment is not an act of "attorney misconduct."

Respondent then criticizes Gratton's counsel's reference to the EEOC charge during closing argument. 1 ER 10-11 (quoting ECF No. 235, p. 85). Respondent

29

states that this reference was "particularly inflammatory" because of the "abstract nature in which it was presented." 1 ER 11. Ironically, Respondent's representation of how prejudicial it was for the EEOC charge to come in without context, supporting evidence, and the opportunity for cross-examination is the very same argument Gratton made, and Respondent rejected, when Respondent improperly excluded this same "context" evidence *in limine. Ibid.*; 2 ER 153-161, 220-246, 250-254, 153.

What's worse, although Respondent barred *Gratton* from introducing evidence *supporting* the veracity of his protected disclosures, Respondent permitted *UPS* to *attack* those same allegations throughout the trial, eliciting testimony that Gratton's allegations were baseless. 5 ER 1066-1067 (overruling Gratton's objection to Leyert's testimony that "[t]here was nothing there"—referencing Gratton's allegations—and "no retaliation"), 1152-1153 (Leyert investigated and found "no merit" to Gratton's complaints); 7 ER 1814 (another Labor Manager, LaShawn Butler, found "no merit" to Gratton's allegations of discrimination).

Through this testimony, UPS opened the door to impeachment and rebuttal with contrary evidence. Gratton's counsel attempted to rebut these contentions by asking Gratton whether he observed a race-based pattern of black drivers being assigned to stay out late. 6 ER 1368-1369. But Respondent sustained UPS's objections, striking Gratton's answer that the drivers routinely "out the latest" were all "black." *Ibid.* Contrary to Respondent's suggestion that this evidence was "time-

barred," the black drivers that Gratton identified were listed as witnesses to the race discrimination grievance filed in *June 2020*, nearly two years *after* the cutoff date imposed by Respondent's pre-trial orders. 8 ER 1942; 3 ER 352, fn. 5; 2 ER 153-161.

Gratton's counsel attempted to introduce this evidence both to explain why he listed these witnesses in the June 2020 grievance already in evidence, and as a means of rebutting management's conclusory assertions that Gratton's grievances had "no merit." Pointedly, each of the drivers Gratton identified as black testified at trial, so the jury *saw for themselves* that they were black; Gratton's testimony merely confirmed that fact for the record. 5 ER 1172 (Anderson sworn); 6 ER 1256 (Briggs sworn), 1466 (Fleming sworn), 1368-1369. Meanwhile, Respondent permitted *UPS* to ask the same witness (Gratton) whether LaShawn Butler is black. 6 ER 1458. Thus, Respondent's restriction on inquiry into the race of trial witnesses unilaterally applied to Gratton, and *not UPS*.

Respondent further suggests that "[Gratton's] counsel sought information surrounding previously excluded harassment evidence [that was] time barred," citing two excerpts of trial testimony. 1 ER 9. Not so. Respondent's first citation sought information about prior complaints of Fromherz's harassment and retaliation that Respondent had previously *admitted* into evidence. 6 ER 1238-1239; 8 ER 1933-1934 (Exh. 14).

31

UPS's MIL 10 sought, amongst other things, to exclude several prior complaints of Fromherz's harassment, bullying, and retaliation against his subordinates. 2 ER 271-283. Gratton contended that this evidence was relevant to show Fromherz was never disciplined, reflecting UPS's tacit approval of his retaliatory behavior. 2 ER 202-23, 216-217. Importantly, Respondent *denied* UPS's motion, permitting inquiry into Fromherz's prior harassment and retaliation. 2 ER 167-168. Indeed, Page 35 of ECF No. 225 merely reflects Gratton's *expressly permitted* examination of one of Fromherz's *many* victims. 6 ER 1238.

UPS's MIL 10 impacts another purported "misconduct" finding in the new trial order, where Respondent states that Gratton "continued to attempt to introduce testimony during Fromherz's exam regarding his 'workplace harassment, bullying, and retaliation,' over several objections from [UPS]." 1 ER 9-10. However, what Gratton was actually "attempting" to do was cross-examine Fromherz about other workers' substantiated complaints—the very complaints Respondent had *already admitted* into evidence pursuant to the same *in limine* ruling. 2 ER 167-168; 6 ER 1227-1235, 1237-1238, 1252-1253.

Even though Respondent ruled *in limine* that these complaints were admissible—and they had already been admitted—Respondent inexplicably barred Gratton from cross-examining Fromherz regarding them. 7 ER 1638-1639. Moreover, Gratton's counsel only "continued" this line of questioning because Respondent

32

equivocated in sustaining UPS's first objection, "den[ying]" this line of inquiry "unless [counsel] narrow[ed] [his] question." 6 ER 1638. Respondent's directive to "narrow" forced Gratton to ask about the four *already admitted* employee complaints individually, lest he waive this appellate issue by failing to confirm Respondent would not permit the narrower questions either. 6 ER 1638-1639.

Nor did Gratton's counsel elicit "time barred" harassment evidence on pages 74-75 of ECF No. 225, as Respondent suggests. 1 ER 9. Although unclear, Respondent appears to be referring to yet another third-party witness, this time a current employee of UPS, testifying that Gratton was so professional that he did not "lose his cool," prompting counsel to ask:

> I just heard you say you would have lost your cool in Mr.
> Gratton's position.
> Yes.
> Why?
> Well, he's professional. He knows how to keep it professional.
> Knows how to keep his temper, especially when he's being, you
> know, harassed at work.
> You saw him being mistreated at work?
> …
> Yeah. I seen him a lot.
> …
> To an extent you would have lost your cool?
> Yes.
> Objection. Motion in limine.
> Objection overruled. Continue.

6 ER 1277-1278. Yet again, Respondent *overruled* UPS's objection. *Ibid.*

Counsel then asked the witness what the "work environment" was "like under Mr. Loomis' leadership," attempting to elicit anticipated (and later provided) testimony that the witness feared retaliation because of what Gratton endured. 6 ER 1278. The witness unexpectedly responded: "Hostile, very. I hated going to work every day. Just very hostile." *Ibid.*

UPS objected to the witness's use of the word "hostile," which had *never* previously been excluded from trial—this time Respondent sustained the objection. 6 ER 1278. Gratton's counsel then asked a more leading question to elicit the information she actually sought: that the witness feared *retaliation. Ibid.*.

Respondent states that "Plaintiff also introduced evidence of UPS's financial condition without laying a proper foundation or achieving the grant of judicial notice." 1 ER 11. However, as Respondent itself notes, the trial was not bifurcated, "[Gratton] requested that [Respondent] take judicial notice of [UPS's] publicly filed 10-K as evidence of its financial condition," and Respondent never ruled on the admissibility of UPS's Form 10-K. 1 ER 12.

As detailed in Gratton's new trial opposition, the only party guilty of misconduct regarding the Form 10-K was UPS. 2 ER 79-83. Throughout the trial, UPS's counsel misrepresented to Respondent that the Form 10-K does not apply to the "UPS, Inc." that purportedly employed Gratton, even though the address on the document matched the address on Gratton's paystubs and was downloaded from the

34

UPS.com website where Gratton applied for the job. *Ibid.* Meanwhile, during the same week as the trial in this action, UPS was taking the opposite position in a district court a few hundred miles away, acknowledging that the 10-K applied to the "UPS, Inc." that employs UPS drivers (like Gratton). *Ibid.*; *see also* 2 ER 27-46.

Respondent next faults Gratton's counsel for attempting alternative means of proving up UPS's financial condition. Specifically, Respondent suggests it was misconduct to ask Loomis if he knew about the company's net worth or the identity of the company's Chief Financial Officer, attempting to lay a further foundation for the Form 10-K Respondent consistently refused to rule on. 1 ER 12-13. Yet again, Respondent expressly permitted Gratton to ask Loomis about UPS's financial condition *during trial*, only declaring this to be "misconduct" after-the-fact. *Ibid.*; 5 ER 956-960; *see also* 7 ER 1539-1541 (permitting Gratton to "lay a foundation" through Loomis).

Finally, Respondent faults Gratton's counsel for calling UPS a "multinational corporation" during closing argument despite "never successfully presenting evidence that Gratton had sued the parent company." 1 ER 13 (quoting ECF No. 235, p. 102). As a threshold matter, UPS did not object to this argument at the time, and thus it cannot serve as a valid basis for misconduct warranting a new trial. 8 RT 1907; *Hemmings*, 285 F.3d at 1193.

35

On the merits—and ignoring that there was *zero* evidence in the record that Gratton's employer has a "parent company"—this was not the source of Gratton's "multinational corporation" argument. Instead, *UPS* introduced Exhibit No. 500 into evidence, a "UPS Policy Handbook" that states: "We Provide Dependable Global Services," including "solutions for ... global air, ocean, and ground transportation." 8 ER 2036 (Exh. 500); *see also* 7 ER 1729. It could not possibly have been "misconduct" for Gratton's counsel to reference this *admitted* evidence—that UPS introduced— during closing argument.

The only act of purported "misconduct" that was not expressly permitted or otherwise induced by Respondent is Gratton's counsel's inadvertent inquiry into a purportedly time-barred event on *one* occasion:

> The scrutiny, the route stuff, the overloading the packages, the denying you help -- you know what, I forgot to ask you. Did Mr. Fromherz ever tell you to get off the property?
> He did.
> Objection, your Honor. That's specifically outside the time period.
> Oh, is it? I'm sorry. If that's outside the time period, I'll take your representation. That would explain why it wasn't in my outline.
> Yes.

6 ER 1431; 1 ER 9.

Respondent's *in limine* rulings included the exclusion of "Fromherz yelling at Plaintiff for picking up a package on his day off"—a purportedly time-barred event. 2 ER 160. As the transcript shows, Gratton's counsel had reached the end of his outline of acts of retaliation during Gratton's direct examination, reading them back to

36

himself to ensure sure he had not forgotten any before turning to damages, when he remembered that he had not asked Gratton about being ordered off the property by Fromherz—evidence that *typically* qualifies as admissible retaliatory intent evidence. 6 ER 1431. Gratton's counsel momentarily forgot that this was the same "yelling" incident Respondent had excluded as purportedly time-barred. Thus, counsel did not realize he was eliciting excluded evidence until UPS's counsel objected, at which point Gratton's counsel immediately accepted UPS' representation, apologized, and moved on. *Ibid.*

In short, there was no "defiance" of Respondent's *in limine* rulings. At worst, Gratton's counsel made a single, inadvertent error while otherwise complying with Respondent's draconian rulings to the letter, even when they directly contradicted earlier rulings on the same subject.

Because the entire new trial order is based on the false premise that Gratton's verdict was the "result of passion or prejudice inflamed by the introduction of time barred evidence that cannot form the basis of the claims Gratton could assert at trial," the order should be vacated and the Judgment restored.

## VII.    CONCLUSION

Respondent's new trial order is based almost exclusively on demonstrably false findings of "attorney misconduct." Contrary to Respondent's ruling, it is not "misconduct" to introduce an exhibit Respondent previously admitted into evidence,

37

to publish exhibits Respondent expressly granted permission to publish, or to inquire into subject matter Respondent expressly permitted inquiry into. It certainly does not satisfy the standard of proving by "clear and convincing" evidence that misconduct which was timely objected to so permeated the entire proceeding as to warrant a new trial.

Meanwhile, the reputational harm resulting from Respondent's erroneous misconduct findings is severe and ongoing. Only immediate writ relief can prevent further irreparable harm to the reputations and business interests of Gratton's counsel, for all the same reasons set forth in *Tillman*.

For the foregoing reasons, this Court should issue a writ of mandamus directing Respondent to vacate its new trial order.

Date: March 14, 2025

PINE TILLETT LLP
SHISHIDO TAREN GOLDSWORTHY PLLC
COLLIER LAW FIRM, LLP


*/s/ Dustin L. Collier*
Dustin L Collier
Robin J. Shishido
Norman Pine
Scott Tillett

*Attorneys for Appellant* Tahvio Gratton,
Robin J. Shishido, and Dustin L. Collier

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** _____

The undersigned attorney or self-represented party states the following:

[x]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**: s/ Robin J. Shishido_____ **Date**: 3/14/25_____
*(use "s/[typed name]" to sign electronically filed documents)*

[**Practice Tip**:  Under Ninth Circuit Rule 28-2.6, each party must identify in a statement on the last page of its initial brief any known related case pending in the Ninth Circuit.  Cases are deemed "related" if they: (a) arise out of the same or consolidated cases in the district court or agency; (b) raise the same or closely related issues; or (c) involve the same transaction or event.  The statement should include the name and appellate docket number of the related case and describe its relationship to the case being briefed.  The purpose of this rule is to alert the parties and the Court to other known cases pending in this Court that might affect how the instant case is managed or decided.  This rule does not require counsel to list all known cases raising the same or closely related issues if the list would be lengthy and counsel in good faith believes that listing the cases would not assist the Court or other parties.  If you don't know of any other related cases in this Court, no statement is required.  If you are the appellee, you don't need to include any related cases identified by the appellant.]

[**Note**: The Court updates its forms from time to time.  Check the Court's website (https://www.ca9.uscourts.gov/forms/#briefs) to be sure you're using the most recent version of this form.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____

I am the attorney or self-represented party.

**This brief contains** 7,640 **words,** including 177 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[ ] it is a joint brief submitted by separately represented parties.
　　[ ] a party or parties are filing a single brief in response to multiple briefs.
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:** s/ Robin J. Shishido_____　**Date:** 3/14/25_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# DECLARATION OF SERVICE

I hereby certify under penalty of perjury under the laws of the State of Washington that I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit.

I further declare that I effected service of the foregoing document on the parties listed below through the CM/ECF system of the United States District Court for the Western District of Washington:

Florence Z. Mao, WSBA No. 49973
florence.mao@ogletreedeakins.com
Elizabeth Falcone, Admitted *Pro Hac Vice*
elizabeth.falcone@ogletreedeakins.com
Michael D. Mitchell, Admitted *Pro Hac Vice*
michael.mitchell@ogletreedeakins.com
Ogletree Deakins, Nash, Smoak & Stewart,
P.C.
222 SW Columbia Street, Suite 1500
Portland, OR 97201
Ph: (503) 522-2140

☐ by Electronic Mail
☐ by Facsimile Transmission
☐ by First Class Mail
☐ by Hand Delivery
☐ by Overnight Delivery
☒ by Notification via E-filing System

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS (pro hac vice)
tevangelis@gibsondunn.com
MADELEINE F. MCKENNA (pro hac vice)
mmckenna@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197 Telephone:
213.229.7000 Facsimile: 213.229.7520

BLAINE H. EVANSON (pro hac vice)
bevanson@gibsondunn.com
MIN SOO KIM (pro hac vice)
mkim@gibsondunn.com
3161 Michelson Drive
Irvine, CA 92612-4412 Telephone:
949.451.3800 Facsimile: 949.451.4220
*Attorneys for Defendant*

DATED this 14th day of March, 2025.

By: *s/ Robin J. Shishido*                  .

Robin J. Shishido, WSBA No. 45926
Richard E. Goldsworthy, WSBA No. 40684
Shishido Taren Goldsworthy PLLC
705 Second Avenue, Suite 1500
Seattle, WA 98104
Telephone: (206) 622-1604
Email: rshishido@shishidotaren.com
          rgoldsworthy@shishidotaren.com
*Attorneys for Plaintiff*